# United States Court of Appeals
## For the First Circuit

No. 21-1612

UNITED STATES OF AMERICA,

Appellee,

v.

JONATHAN MONSON,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark G. Mastroianni, U.S. District Judge]

Before

Barron, Chief Judge,
Lipez and Howard, Circuit Judges.

Jin-Ho King, with whom Milligan Rona Duran & King, LLC., was
on brief, for appellant.
Mark T. Quinlivan, Assistant United States Attorney, with
whom Rachael S. Rollins, United States Attorney, was on brief, for
appellee.

June 26, 2023

HOWARD, **Circuit Judge**.  A jury convicted Jonathan Monson on fifteen counts of an indictment charging sexual exploitation of children and distribution, receipt, and possession of child pornography.  He was sentenced to 480 months' incarceration.  On appeal, Monson challenges the admission of certain evidence against him at his trial, the sufficiency of the evidence against him, and his sentence.  Concluding that each challenge is unavailing, we affirm.

## I. BACKGROUND[1]

In 2017, while participating in an undercover capacity in a Kik Messenger ("Kik")[2] group named "Taboo Train 2.0," an FBI agent observed not only that the group's discussion focused on child pornography but also that one of the group's members was distributing child pornography to the group.  That user, whose screen name consisted of four emoticons followed by the name "john (daddauluv_r6n@talk.kik.com)," transmitted five images constituting child pornography to the group.[3]  Suspicious that

---

[1] In assessing the sufficiency claim, we recount the facts in the light most favorable to the verdict.  United States v. Burgos-Montes, 786 F.3d 92, 98 (1st Cir. 2015).  For the suppression of evidence claim, we offer a balanced account.  Id.; United States v. Piper, 298 F.3d 47, 50 (1st Cir. 2002).

[2] Kik is a cloud-based social media application that permits users to anonymously share text and multi-media messages with one another, both one-on-one and in group chats.

[3] Those five images formed the bases for Counts 5-9.

Monson was the user distributing the child pornography, agents obtained search warrants for Monson, his residence in Granby, Massachusetts, and his vehicles.

In March 2018, FBI agents and local law enforcement officers, armed and dressed in tactical gear, went to Monson's home to execute the search warrant. During the execution of the warrant, FBI Special Agent Ian Smythe expressed his desire to speak with Monson, told Monson "that they perhaps would be better off finding a place with less activity" to speak, and informed Monson that he was neither in custody nor under arrest. Monson agreed to accompany the agents to the Granby Public Safety Complex, a community building which housed both the Granby police station and fire station, and to speak with Smythe there. At the public safety complex, Smythe and Special Agent Michael Sheehan led Monson to a public conference room that was in the building's lobby -- not in the section of the building designated as the police station -- where they then interviewed him. Smythe advised Monson of his Miranda rights and Monson signed a form acknowledging that he understood those rights and was willing to answer questions without a lawyer present.

During the interrogation, Monson made a number of admissions including: that he had an eleven-year-old daughter; that he had installed Kik onto his iPhone and had used Kik to find groups associated with incest fantasy and child pornography; that

the Kik account with the username consisting of four emoticons and "john (daddauluv_r6n@talk.kik.com)" belonged to him; that "daddauluv" referred to "daddy-daughter love"; that he became active in the group "Taboo Train 2.0" over a year earlier using an iPhone 6 -- which he had since traded in for an iPhone 7 Plus -- and that he had posted images to that group; that he would frequently engage in "tickle fights" with his daughter and that he may have touched her groin area; and that he had, on one occasion, taken his iPhone into the bathroom while his daughter was showering and "accidentally" took pictures which might still be on his iPhone.

Following that interrogation, the agents seized Monson's iPhone 7 Plus. Monson then underwent a polygraph examination and a subsequent interview with a different agent, during which Monson made additional incriminating admissions. At the conclusion of the second interview the agents arrested Monson. Examination of Monson's iPhone 7 Plus revealed evidence of the sexual exploitation of children as well as child pornography.

In a superseding indictment the government brought fifteen criminal counts against Monson: the first four counts alleged Sexual Exploitation of Children (18 U.S.C. § 2251(a)); counts five through twelve alleged Distribution of Child Pornography (18 U.S.C. § 2252A(a)(2)(A)); counts thirteen and fourteen alleged Receipt of Child Pornography (18 U.S.C.

§ 2252A(a)(2)(A)); and count fifteen alleged Possession of Child Pornography (18 U.S.C. § 2252A(a)(5)(B)).

In advance of trial, Monson sought to suppress the statements that he had made during his initial interview at the Public Safety Complex on the basis that those statements were made during a custodial interrogation and that he had not waived his Fifth Amendment rights before making the incriminating statements.[4] Finding that Monson was not in custody at the time of the interrogation, the district court denied the suppression motion. Trial spanning five days was had before a jury, and at the close of the evidence, Monson moved unsuccessfully for a judgment of acquittal, see Fed. R. Crim. P. 29(a), on the four child exploitation counts on sufficiency grounds.

The jury subsequently found Monson guilty on all fifteen counts, and the district court sentenced Monson to 480 months' incarceration.

## II. DISCUSSION

On appeal, Monson brings three distinct challenges. First, he argues that the district court erred in denying his Rule

---

[4] At the hearing on Monson's motion to suppress, Monson's counsel clarified that the motion concerned only the admission of statements made during the initial interrogation by Smythe (and not any statements made during his polygraph examination or the second interrogation -- conducted by a different FBI agent -- which followed that examination).

29(a) motion because the evidence at trial was insufficient to satisfy the jurisdictional element of the child exploitation counts. Second, Monson argues that the court erred in denying his suppression motion because he was interrogated while he was in custody but had not waived his <u>Miranda</u> rights. Finally, he challenges the procedural reasonableness of his sentence on the ground that the district court incorrectly determined his Guidelines sentencing range. We address each argument in turn.

### A. THE SUFFICIENCY OF THE EVIDENCE

We begin with the challenge to the sufficiency of the evidence on counts one through four because his success on that score would render moot the other claims of trial and sentencing error on those counts. <u>United States</u> v. <u>Ramírez-Rivera</u>, 800 F.3d 1, 16 (1st Cir. 2015), <u>abrogation on other grounds recognized by</u> <u>United States</u> v. <u>Leoner-Aguirre</u>, 939 F.3d 310 (1st Cir. 2019).

### i.

Preserved challenges to the sufficiency of the evidence are reviewed de novo, <u>see</u> <u>United States</u> v. <u>Ocean</u>, 904 F.3d 25, 28 (1st Cir. 2018), and we will sustain the jury's verdict if the record evidence -- "evaluated in the light most favorable to the verdict . . . [and] including all plausible inferences drawn therefrom" -- would permit a rational factfinder to find the defendant guilty beyond a reasonable doubt. <u>United States</u> v. <u>Torres Monje</u>, 989 F.3d 25, 27 (1st Cir. 2021) (internal quotation

marks omitted) (quoting United States v. Santos-Rivera, 726 F.3d 17, 23 (1st Cir. 2013)).

### ii.

18 U.S.C. § 2251(a) provides that "[a]ny person who employs, uses, persuades, induces, entices, or coerces any minor to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct . . . shall be punished . . . if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer."  As used in § 2251(a), Congress defined "producing" to include "producing, directing, manufacturing, issuing, publishing, or advertising."  18 U.S.C. § 2256(3).  As have several other circuits, we have held that § 2251(a) is thus to be understood to criminalize both the initial recording or creation of child exploitation materials as well as the subsequent creation of copies or subsequent reproduction of those materials.  See United States v. Poulin, 631 F.3d 17, 23 (1st Cir. 2011) ("Congress intended a broad ban on the production of child pornography and aimed to prohibit the varied means by which an individual might actively create it.  As such, the government did not need to establish at what point 'production' occurred, nor produce in evidence a recording device." (internal citations omitted)); United States v. Burdulis, 753 F.3d 255, 262 (1st Cir. 2014) ("When

a person loads an image onto a thumb drive from the internet or another source, that person has created a new copy of the image in the digital memory of the thumb drive.  As the Ninth Circuit put it, '[w]hen the file containing the image is copied onto a disk, the original is left intact and a new copy of the image is created, so the process "produces" an image.'" (alteration in original) (quoting United States v. Guagliardo, 278 F.3d 868, 871 (9th Cir. 2002) (per curiam))); United States v. Lacy, 119 F.3d 742, 750 (9th Cir. 1997); United States v. Dickson, 632 F.3d 186, 189-90 (5th Cir. 2011); United States v. Caley, 355 Fed. Appx. 760, 761 (4th Cir. 2009); United States v. Maxwell, 386 F.3d 1042, 1052 (11th Cir. 2004), vacated but later reinstated in relevant part, see 446 F.3d 1210, 1211 (11th Cir. 2006); United States v. Angle, 234 F.3d 326, 341 (7th Cir. 2000).

### iii.

In contending that the evidence was insufficient to satisfy the jurisdictional element of the child exploitation counts, Monson takes two tacks.  He first argues that the evidence did not establish that the image which formed the basis of count one was produced using materials that had travelled in interstate commerce, because that image was created with Monson's iPhone 6; neither that iPhone 6, nor any information regarding it, were admitted into evidence at trial; and the image was created before Monson's iPhone 7 Plus (which was part of the evidence) was

manufactured.  Monson contends that this gap precludes any finding that the child exploitation occurred with the purpose of creating the reproduction of the image that was found on that iPhone 7 Plus. He separately argues that the evidence was insufficient to establish that his iPhone 7 Plus, which contained the four images underlying the child exploitation counts, had travelled in interstate commerce.  Finding both arguments unavailing, for the reasons discussed below, we affirm the district court's denial of Monson's Rule 29 motion for acquittal.

### The iPhone 6 Argument (Count One)

Monson's challenge to the sufficiency of the evidence underlying his conviction on count one focuses on the phrase "that visual depiction" in connection with the interstate or foreign commerce requirement in § 2251(a).  The use of the word "that," Monson argues, links the conduct element (the use of a minor for the purpose of producing any sexually explicit visual depiction) with the commerce requirement such that the same visual depiction (that is, the same image file) constitute both the prohibited conduct and the commerce nexus.  In making this argument, Monson relies on the Sixth Circuit's reasoning in United States v. Lively, 852 F.3d 549, 558 (6th Cir. 2017), that

> The word "that" links the two parts of
> § 2251(a).  As used here, "that" is an
> adjective.  In the second part of § 2251(a),
> "that" modifies and restricts the noun "visual
> depiction," which is also used in the first

part of the statute.  The most natural reading
of § 2251(a) is clear: "that" clarifies that
the "visual depiction" in the first half of
§ 2251(a) is the same "visual depiction" the
second jurisdictional hook addresses.  Thus,
to violate § 2251(a), a defendant must
sexually exploit a minor for the purpose of
producing a visual depiction of this
exploitation, and that same visual depiction
must be produced using materials that have an
interstate-commerce nexus.

A jury could not find that Monson violated § 2251(a)
with respect to the image underlying count one, he argues, because
his use of a minor and his initial creation of a visual depiction
of that use occurred before the iPhone 7 Plus on which the image
was discovered had even been manufactured.  Accordingly, a jury
could not find that he had "the purpose to produce" the visual
depiction that was located on the iPhone 7 Plus at the time that
he used the minor to create the initial visual depiction on his
iPhone 6, preventing the requisite link between the conduct element
and interstate commerce requirement.  We reject this argument.

Even if we were to accept and apply Monson's narrowing
construction of § 2251(a), when viewed in the light most hospitable
to the verdict the evidence is nonetheless sufficient to permit a
reasonable factfinder to conclude that Monson intended to create
subsequent copies of the image (including, specifically, the copy
that was discovered on his iPhone 7 Plus) at the time that he

created the initial depiction.[5]  There was evidence that, less than

a year after Monson initially captured the image on his iPhone 6,

he saved the image to his iCloud account, linked that iCloud

account to his iPhone 7 Plus, populated the image onto his iPhone

7 Plus from his iCloud account, and then continued to store the

image on his iPhone 7 Plus.  From this evidence, a reasonable jury

could conclude that Monson intended, at the time the initial

depiction was created, to make and populate subsequent copies of

that image on devices linked to his iCloud account including and

especially any subsequent iPhones that he obtained to replace his

iPhone 6.  See Downs, 56 F.4th at 1321-22 (finding that a

reasonable jury could conclude that the defendant had the requisite

intent to create subsequent copies at the time of initial capture

based on circumstantial evidence, including that subsequent copies

were actually created).

On this point, the Sixth Circuit's decision in Lively

does not suggest a contrary conclusion.  In Lively, the court held

that the jurisdictional element in § 2251(a) was not satisfied

based on a co-defendant's subsequent copying of the images at issue

onto a hard-drive because "there [was] no reason to believe that

Lively had the purpose of producing -- or having [the co-defendant

---

[5] To be clear, in assuming the narrow construction of § 2251(a) we do not mean to endorse it or to suggest that our prior precedent necessarily permits it.

produce] -- the Hard-Drive images." 852 F.3d at 554. <u>Lively</u> thus is properly viewed as a case in which an independent actor produced the hard drive image, and that conduct could not priorly be imputed to the defendant who created the previous image. <u>Cf.</u> <u>Pattee</u>, 820 F.3d at 511, n.8 ("[M]erely transferring or copying a pornographic image that was produced by someone else is [not] tantamount to 'producing' child pornography.").

**The iPhone 7 Plus Argument (Counts One through Four)**

Monson also argues that there was a lack of evidence that his iPhone 7 Plus travelled in interstate commerce, and thus that there was insufficient evidence to support a conviction for child exploitation based on the discovery of the images on that phone.

At trial, the government sought to prove the interstate commerce nexus for the child exploitation counts by introducing records from Apple Inc. showing that a black iPhone 7 Plus bearing a specific 15-digit international mobile equipment identity (IMEI) number was manufactured in Kunshan, China in 2017 before being shipped to the United States, and then eliciting testimony from Smythe that Monson's iPhone 7 Plus (which Smythe had examined on multiple occasions) bore the same IMEI number as listed in the Apple records and thus was the phone to which those records referred. Monson argues that this evidence was not sufficient to establish that his iPhone was the same iPhone referred to in the

Apple records because the evidence "forced the jury to speculate that [Smythe] could recall the fifteen digit IMEI for Mr. Monson's iPhone 7 Plus and accurately compare it to the IMEI listed on the Apple records, notwithstanding that the Apple records described the phone as 'BLACK' and the witness recalled the phone to be '[n]ot black.'"[6] According to Monson, "[t]his kind of speculation cannot support a finding of guilt beyond a reasonable doubt." We reject the argument.

Generally, "[i]t is the responsibility of the jury -- not the court -- to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos v. Smith, 565 U.S. 1, 2 (2011) (emphasis added). The jury supportably could have found the evidence to point to the iPhone 7 Plus described in the Apple records as the same iPhone that the agents seized from Monson. While a reasonable juror could have viewed Smythe's ability to recall the specific IMEI number or failure to accurately describe the color of the phone with skepticism, the record does not compel the conclusion that the testimony was insufficient to establish that the Apple records described Monson's iPhone 7 Plus. As we have often stated, "[w]hen

---

[6] Smythe's report and testimony described the iPhone 7 Plus as dark gray.

the record is fairly susceptible of two competing scenarios, the choice between those scenarios ordinarily is for the jury." United States v. Dwinells, 508 F.3d 63, 74 (1st Cir. 2007); see also United States v. Seary-Colón, 997 F.3d 1, 11-12 (1st Cir. 2021) ("We need not conclude that 'no verdict other than a guilty verdict could sensibly be reached, but must only [be] satisf[ied] . . . that the guilty verdict finds support in a plausible rendition of the record.'" (alterations in original) (quoting United States v. Hatch, 434 F.3d 1, 4 (1st Cir. 2006))).

Concluding that the evidence presented at trial was sufficient to support Monson's convictions on each of the child exploitation counts, we affirm the district court's denial of Monson's Rule 29 motion for acquittal.

## B. The Suppression Ruling

Monson also argues that the district court erred in denying his motion to suppress statements, because those statements were made during a custodial interrogation without there having been a valid waiver of his Miranda rights. Because we cannot upset the district court's finding that Monson was not in custody at the time that he made the statements at issue, we affirm the denial of the suppression motion.

### i.

"In reviewing a district court's decision on a motion to suppress, we scrutinize findings of fact for clear error and

conclusions of law de novo." United States v. Miles, 18 F.4th 76, 78 (1st Cir. 2021) (citing United States v. Simpkins, 978 F.3d 1, 6 (1st Cir. 2020)).

"[T]he [Supreme] Court [has] made clear that the ultimate determination of custody is a mixed question of fact and law. The initial examination of the 'totality of the circumstances' is factual. The second inquiry, however -- whether, objectively, these circumstances constitute the requisite 'restraint on freedom of movement of the degree associated with a formal arrest' -- requires the 'application of the controlling legal standard to the historical facts.'" United States v. Ventura, 85 F.3d 708, 711 n.2 (1st Cir. 1996) (quoting Thompson v. Keohane, 516 U.S. 99, 112 & n.11 (1995)); see United States v. Mittel-Carey, 493 F.3d 36, 39 (1st Cir. 2007). Accordingly, we review for clear error the district court's findings as to the circumstances surrounding the interrogation, and review de novo the court's conclusion as to whether, under those circumstances, a reasonable person would have felt free to end the interrogation and leave. United States v. Infante, 701 F.3d 386, 396 & n.9 (1st Cir. 2012)

### ii.

Statements made by a defendant during a custodial interrogation are inadmissible at trial unless, in advance of the interrogation, the defendant was advised that he "has a right to

remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed" and the defendant knowingly and voluntarily waived those rights. Miranda v. Arizona, 384 U.S. 436, 444 (1966); see also Dickerson v. United States, 530 U.S. 428, 432-33 (2000).

"Accordingly, the need for a Miranda warning 'turns on whether a suspect is in custody.'" United States v. Swan, 842 F.3d 28, 31 (1st Cir. 2016) (quoting United States v. Hughes, 640 F.3d 428, 435 (1st Cir. 2011)). A two-step inquiry is used to determine whether a suspect is in custody. See Howes v. Fields, 565 U.S. 499, 509 (2012); United States v. Melo, 954 F.3d 334, 340 (1st Cir. 2020). First, it must be determined whether, based on the objective circumstances surrounding the interrogation, a reasonable person would have felt free to terminate the interrogation and leave. Fields, 565 U.S. at 509. Second, if it is determined that a reasonable person would not feel free to do so, it must then be determined whether the environment in which the interrogation occurred "present[ed] the same inherently coercive pressures as the type of station house questioning at issue in Miranda." Id.

Factors that we have identified previously as relevant to the custody inquiry include the setting of the interrogation, "the number of law enforcement officers present at the scene, the

degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." Swan, 842 F.3d at 31 (quoting United States v. Masse, 816 F.2d 805, 809 (1st Cir. 1987)). However, this is "by no means an exhaustive list" and a court must consider the totality of circumstances surrounding the interrogation to determine whether it was custodial. Mittel-Carey, 493 F.3d at 39. Further, those circumstances are to be evaluated objectively, "not [based] on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury v. California, 511 U.S. 318, 323 (1994).

### iii.

Assessing the totality of the circumstances in light of the precedents above, we conclude that a reasonable person in Monson's position would have felt free to terminate the interrogation and leave and thus affirm the district court's suppression ruling.

To begin, the questioning of Monson took place in a conference room at the Granby Public Safety Facility. While it is true that the Granby police department was housed in that same complex, the record reflects that Monson did not enter the police station before or during the interrogation by Smythe, that "the police station really had no part in this interview other than that it was under the same roof inside this larger community building," and that the conference room "was not designed in any

way to be a law enforcement type room that was set up for police purposes" but "was just an open space with a table and some chairs and the door opened out into a common area within this building." Accordingly, although the location of the interrogation was unfamiliar to Monson, it was more akin to a neutral location than a police station interview room, a factor that weighs in favor of concluding that the interrogation was non-custodial. See Infante, 701 F.3d at 397 (questioning in a neutral setting -- a hospital room -- weighed in favor of interrogation being non-custodial); United States v. Jones, 187 F.3d 210, 218 (1st Cir. 1999) ("Although the location apparently was not familiar to [the suspect] and the area was not well-lit, a public highway is a neutral setting that police officers are not in a position to dominate."); United States v. Campbell, 741 F.3d 251, 267 (1st Cir. 2013) ("The defendants were questioned in a neutral location, a hotel parking lot.").

Next, the record reflects that two members of law enforcement travelled with Monson to the community center and that only two law enforcement agents were present during his questioning. In arguing that the interrogation was custodial, Monson highlights the fact that eight or nine agents and police officers arrived at his home to carry out the search warrant, and he contends that this number supports a finding that he was in custody. However, because the focus of our inquiry is on Monson's

interrogation, see Swan, 842 F.3d at 31 ("[I]n conducting the Miranda analysis, we focus on the time that the relevant statements were made"), the number of agents present when Monson made the statements that he seeks to suppress is the relevant number for us to consider, not the total number of agents and police officers who participated in the investigation or search of Monson's property.  See Hughes, 640 F.3d at 436 ("[A]lthough four officers trekked to the island, only two of them participated in the questioning."); United States v. Crooker, 688 F.3d 1, 12 (1st Cir. 2012) ("[A]lthough [numerous] officers were present inside and around [the suspect's] house, no more than two agents were in direct conversation with [the suspect] at one time."); cf. Mittel-Carey, 493 F.3d at 40 (presence of eight officers in suspect's home weighed towards custodial nature of interrogation because interrogation took place at the home with all eight officers present).  That only two agents were present for Monson's interrogation weighs in favor of a conclusion that the interrogation was non-custodial.  See Hughes, 640 F.3d at 436; Crooker, 688 F.3d at 12; Swan, 842 F.3d at 32; see also United States v. Quinn, 815 F.2d 153, 157 (1st Cir. 1987) ("[W]e do not believe the physical presence of two more officers, besides the three who were there when the two suspects first arrived, could have led to a reasonable inference that a de facto arrest had occurred.").

Third, the record reflects that there was no physical restraint placed upon Monson at any time during the interrogation. The district court found that Monson "was not restrained in any way," and that "[the interrogation] occurred in this community room that clearly was not confining him. . . . There was no degree of restraint. There was no indication that he was put in a corner and an agent sat next to him and he couldn't move. There was no indication of locking doors or any type of other restraint." We have previously explained that among the factors relevant to the custodial inquiry, "the element that carries the most weight is the level of physical control that the agents exercised over the defendant during the search and interrogation," Mittel-Carey, 493 F.3d at 40, and that a lack of any physical control, contact or restraint weighs heavily in favor of a conclusion of no-custody. See United States v. Nishnianidze, 342 F.3d 6, 14 (1st Cir. 2003); Swan, 842 F.3d at 33; Infante, 701 F.3d at 398; Hughes, 640 F.3d at 436 ("[W]e think it significant that no meaningful physical restraint was applied to the defendant.").

Monson argues that, despite the absence of any physical restraint, he lacked "true freedom of movement" because "the agents dictated when and how [he] moved." In support, Monson highlights that he was transported to the public safety complex by the agents and told that they would drive him back home when they were finished. But the force of this point is undermined by the fact

that Monson went to the police station with the agents voluntarily. See Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (no custody where, inter alia, the suspect "came voluntarily to the police station"); McCown v. Callahan, 726 F.2d 1, 6 (1st Cir. 1984) (explaining that "we d[id] not see how one could say, as a matter of law, that [the suspect] was in custody when he was questioned" because, in addition to other factors, he "c[a]me to the station voluntarily"); Quinn, 815 F.2d at 160 ("Even when questioning occurs in the stationhouse, a suspect need not be given Miranda warnings if he went there voluntarily and there was no such restriction on his freedom as to render him in 'custody.'" (emphasis added) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983))); United States v. Ellison, 632 F.3d 727, 730 (1st Cir. 2010) (Souter, J.) (fact that suspect was the one who suggested the interview was a relevant factor to our conclusion of no-custody). Indeed, we have previously explained that where a suspect was "not ordered to ride with [the officers]" but that instead transportation by the police "was merely a suggestion to which [the suspect] agreed," this further undermines any suggestion of custody or a lack of freedom of movement. Swan, 842 F.3d at 31.

Fourth, the duration and character of the interrogation suggest that Monson was not in custody. The interrogation lasted

for approximately one hour,[7] a factor which weighs against the custodial nature of the interrogation. We have previously characterized interrogations that were ninety minutes as "relatively short" and held that the length of those interrogations did not suggest custody. Hughes, 640 F.3d at 437; Swan 842 F.3d at 33. Further, the district court found that the "[t]he character of the questioning was conversational," and that it "was not aggressive at all or adversarial." These too are findings which suggest that the interrogation was non-custodial. See Swan, 842 F.3d at 33; Infante, 701 F.3d at 397 ("The atmosphere was non-confrontational."); Hughes, 640 F.3d at 437 ("[T]he ambiance was relaxed and non-confrontational throughout the interview. The

_____

[7] Monson argues that we should consider the time that he spent undergoing the post-interrogation polygraph examination and the second, post-polygraph, round of questioning when assessing the total length of his interrogation and, accordingly, that we should consider the over five total hours Monson spent at the complex to constitute a "lengthy" interrogation. However, to the extent that Monson means to suggest that the district court's factual finding that the interrogation lasted one hour was clearly erroneous, this argument is undeveloped and thus waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). Moreover, as discussed above, supra note 4, Monson explicitly represented to the district court that his motion to suppress focused solely on the initial interrogation by Smythe, precluding Monson from now arguing that the motion concerned the whole of his interactions with law enforcement on the date he was arrested. See United States v. Chen, 998 F.3d 1, 6 (1st Cir. 2021) ("An issue may be waived when a party purposefully abandons it, either expressly or by taking a contrary position at trial. A party who waives an issue at trial cannot later complain on appeal by pressing a position that was not taken at trial." (internal citations omitted)).

troopers' demeanor remained calm. . . . The troopers were polite and never hectored the defendant.").

Finally, among the totality of the circumstances surrounding the interrogation are additional factors that support the conclusion that the interrogation was non-custodial. These include the facts that (1) the agents informed Monson that he was neither in custody nor under arrest, see Infante, 701 F.3d at 398 (emphasizing such statements as relevant to conclusion that suspect was not in custody); (2) Monson was never pat frisked or physically searched and maintained his cell phone on him throughout the interrogation, see Swan, 842 F.3d at 33 (suspect's ability to access her cell-phone during the interrogation weighed against finding of custody); (3) the interrogation took place in the middle of the afternoon,[8] see Infante, 701 F.3d at 398 (questioning of suspect "occurred in the late morning and early afternoon, as opposed to a time that might have appeared more menacing," weighing in favor of no-custody); and (4) although the law enforcement representatives were armed, their weapons were holstered and were

---

[8] Monson argues that, because he worked evenings, "the time was effectively an early hour" and we should treat it as such when assessing whether he was in custody. This argument, however, runs directly contrary to our obligation to evaluate the circumstances objectively and "not [based] on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury, 511 U.S. at 323. Objectively, a reasonable person would not consider the early afternoon to constitute an early hour and would not view the decision to conduct the search and interrogation at that time as particularly menacing.

not pointed at Monson.  See Hughes, 640 F.3d at 435-36 (no custody where visible weapons remained holstered throughout the interaction); cf. Crooker, 688 F.3d at 11 (no custody where the "officers holstered their guns after the entry team cleared the house and left them holstered throughout the afternoon-long search").

To be sure, not all of the facts weigh in favor of a conclusion that the interrogation was not custodial.  The record reflects that the agents made it clear to Monson that he was the focus of their investigation, and that they never told Monson that he was free to leave.  However, neither of these facts are determinative, nor do they outweigh the many facts suggesting that Monson was not in custody.  See United States v. Lanni, 951 F.2d 440, 443 (1st Cir. 1991) (holding that the district court did not commit clear error in finding that the suspect was not in custody despite fact that officers never told suspect he was free to leave or terminate the interrogation); Mathiason, 429 U.S. at 494-95 (holding suspect was not in custody despite fact that he was told he was a suspect in a theft and, falsely, that the officers had evidence incriminating him).

Accordingly, considering the totality of the circumstances attending the interrogation, we uphold the district court's determination that Monson was not in custody, and thus that a Miranda warning was not required, at the time of his

interrogation by Smythe because a reasonable person in Monson's position would have felt free to terminate the interrogation and leave.

### C. THE SENTENCE

Finally, Monson levies two challenges against the district court's calculation of his Guidelines sentencing range, contending that, because of the alleged miscalculation, his incarcerative sentence of 480 months is procedurally unreasonable. Because we conclude that any error in calculating the Guidelines range did not affect the district court's sentencing and thus was harmless, we affirm the sentence imposed.

### i.

Because Monson did not raise an objection to either the Guidelines calculation or to the sentence in the district court, we review his challenge only for plain error. United States v. Taylor, 848 F.3d 476, 496 (1st Cir. 2017). To succeed under that standard, Monson must show "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001).

**ii.**

"'[F]ailing to calculate (or improperly calculating) the
Guidelines range' is a 'significant procedural error.'" United
States v. Tavares, 705 F.3d 4, 25 (1st Cir. 2013) (alteration in
original) (quoting Gall v. United States, 552 U.S. 38, 51 (2007)).
That said, in order to succeed on a plain-error challenge to
sentencing, it is the defendant's burden to demonstrate a
reasonable likelihood that, absent the court's error, the district
court would have imposed a more favorable sentence than it did.
See United States v. Marchena-Silvestre, 802 F.3d 196, 200 (1st
Cir. 2015). "In most cases a defendant who has shown that the
district court mistakenly deemed applicable an incorrect, higher
Guidelines range has demonstrated a reasonable probability of a
different outcome." Molina-Martinez v. United States, 578 U.S.
189, 200 (2016). However, "[t]here may be instances when, despite
application of an erroneous Guidelines range, a reasonable
probability of prejudice does not exist" such as when the record
demonstrates "that the district court thought the sentence it chose
was appropriate irrespective of the Guidelines range" or where the
district court's explanation "make[s] it clear that the judge based
the sentence he or she selected on factors independent of the
Guidelines." Id. Accordingly, the government is permitted to
counter the presumption that a Guidelines calculation error was
prejudicial by pointing to a clear statement from the sentencing

court providing "an indication that the trial court 'intended to
untether' the sentence from the Guidelines range." Taylor, 848
F.3d at 498 (quoting United States v. Hudson, 823 F.3d 11, 19 (1st
Cir. 2016)).

### iii.

Monson's procedural challenge to the district court's
calculation of the applicable Guidelines range at sentencing is
two-fold: first, he contends that the district court incorrectly
determined his total offense level due to a grouping error; second,
he argues that the district court incorrectly calculated his
Guidelines sentence due to the court's misapplication of U.S.S.G.
§5G1.1.  However, both of these challenges fail for the same
reason: the record demonstrates that the sentence imposed by the
district court was independent of, and based on factors unrelated
to, the Guidelines sentence and that the district court explicitly
stated its intent to uncouple the sentence from the Guidelines by
noting that they were inapplicable in a case such as this.  Because
the district court's sentence was not based on a Guidelines range,
any error that the court may have made in calculating that
Guidelines range (through either its determination of Monson's
total offense level or its application of U.S.S.G. §5G1.1) had no
effect.  Each of Monson's challenges thus fails on the third prong
of our plain error review, because he cannot demonstrate that he

would have received a lesser sentence but for the district court's alleged errors.

The district court opened Monson's sentencing hearing by stating "the Court accepts the presentence report guideline calculation as being accurate" but noted that it "recognized that the numbers are extraordinarily high and generally inapplicable in a situation like this because of how the numbers come out."  The court thus clarified that its acceptance of the Guidelines range was a mere technicality, indicating that its sentencing determination was independent of that Guidelines calculation.  The court discussed at length the various factors that it considered in determining an appropriate sentence including the seriousness of the offense, the impact of the offense on the victims, and Monson's background (including his lack of prior criminal history, his military service, his steady record of employment, and his amenability to rehabilitation).  The record thus reflects that it was these factors, and not the Guidelines calculation (which the court expressly indicated was inapplicable here) that drove the court's sentencing determination.

Monson argues that the court nonetheless used the Guidelines as a starting point to determine his sentence, and thus its erroneous calculation of the applicable Guidelines range led to a higher sentence than would have been imposed but for the errors.  In support of this argument, he points to the fact that

the court mentioned the higher Guidelines range that was applied in a different case concerning similar conduct as a means of differentiating the defendant in that other case from Monson. However, read in the context of the sentencing hearing as a whole, we do not view the court's brief mention of that higher Guidelines range as demonstrating that the court used Monson's Guidelines range as a starting point in determining an applicable sentence. The court discussed the other case -- United States v. Deordio, No. 3:18-cr-30056-MGM (D. Mass. Feb. 4, 2021) -- in response to the government's recommendation that the court impose the same sentence on Monson that it had imposed on the defendant in Deordio (720 months).  The court responded to this suggestion by noting that there was "a much different criminal history between [Monson and Deordio], much different in life circumstances, and much different in amenability to rehabilitation, but very different with respect to prior criminal history."  The court then proceeded to note the different Guidelines ranges in the two cases -- 5,040 months for Deordio compared to 4,080 months for Monson -- while again explaining that "the use of the Guidelines in these types of cases . . . falls by the wayside a little."  Read in this context, we construe the district court's mention of the Guidelines ranges as merely intended to further illustrate that the very different backgrounds and criminal histories of the two defendants rendered them differently situated at sentencing.  We do not, however, read

that reference to the Guidelines as indicating that the court used either defendant's Guidelines range as a starting point in determining the applicable sentence for Monson, especially given that the court repeatedly and explicitly disclaimed the applicability of the Guidelines to its sentencing determination.

Because we conclude that the sentence imposed by the district court was not tethered to the Guidelines range, any error that the district court may have made in calculating that range did not affect Monson's rights or result in a higher sentence than would have been imposed in the absence of the alleged errors.

### III. CONCLUSION

For the foregoing reasons, the convictions and sentence are **affirmed**.